Casey, C. J.,
delivered the opinion of the court:
This case arises under the provisions of the act of Congress approved July 2, 18C4, entitled “ An act in addition to the several acts concerning commercial intercourse between loyal and insurrectionary States,” &c. And in pursuance of the regulations of the Secretary of the Treasury and the orders of the President under said act.
On the 5th of December, 1864, H. A. Risley, an agent of the Treasury Department, at Norfolk, Virginia, for the purchase of the products of insurrectionary States, entered into the following contract with the claimant:
“Memorandum of agreement made December 5, 1864, between H. A. Sisley, agent authorized to purchase for the United States products of States declared in insurrection, of one part, and James O. P. Burnside, of the other part.
“ The said Burnside agrees to sell to said Risley, agent as aforesaid, and to deliver to him at Norfolk, and Beaufort, North Carolina, 10,000 bales of cotton, 5,000 barrels of tar, 5,000 barrels of rosin, 50,000 pounds of tobacco, products of the States of Virginia and North Carolina ; and the said Risley agrees to purchase said products on the following terms and conditions : ■
“ The said products to be sold in New York or Baltimore, by or under the direction of said Risley, on the same conditions as other sales of like public property are made, all expenses, costs, and charges connected with the purchase, storage, transportation and sale of the same, together with the internal revenue tax and permit fees prescribed by regulations, to be first paid, and the net proceeds over and above such expenses, costs, charges, taxes and fees to be disposed of as follows :
“ II. One-fourth part thereof to be retained for the United States, and three-fourths parts to be paid to the said Burnside or his legal representatives.
“ And it is further agreed between the parties that all cotton transported under this contract shall be consigned to said Risley, agent as aforesaid, and shall be shipped on a government transport, or if not so shipped, shall be in immediate charge of an agent to be appointed by said Risley, whose compensation and expenses shall be paid by said Burnside.
“Nothing in this contract contained shall be construed as incurring any liability on behalf of the United States.
“ H. A. Risley,
“ Superintending Special Agent, Sfc., authorized to purchase products, Sfc. “ Jas. O. P. Burnside.”
*377 On the 8th of December Eisley gave the claimant a certificate of contract, and requested for him safe-conduct according to the treasury regulations and the Executive orders issued thereon.
Under this contract the claimant purchased, at or near Elizabeth City, in December, 1864, and the early part of January, 1865, two different lots of cotton. The first lot consisted of 51 bales. It was laden upon a schooner and started for Norfolk, but, under orders from General Grant prohibiting vessels coming in or going out at that time, .the vessel returned to Elizabeth City, and remained there several weeks before such orders were revoked. The cotton was then shipped to Norfolk to the agent of the treasury, and by him sent to New York, where it was sold, and after deducting the expenses the claimant’s portion was paid over to him 'by Mr. Eisley. Nothing is claimed in respect of this cotton.
The agent of the claimant purchased another lot of 41 bales, and had it stored at Elizabeth City, and ready to ship to Norfolk and New York. While it was in the warehouse at that place the United States steamer Lockwood visited that town and seized the cotton, under the orders of Commander Macomb, of the navy, commanding the District of the Sounds. The cotton was taken to Newbern, North Carolina, and there delivered to Mr. Heaton, the treasury agent at that point, as captured and abandoned property.
The regulations of the Treasury Department, in reference to the purchase of products of insurrectionary States, under the act of July 2, 1864, were published on the 24th of September following. On the same day they were approved by the President of the United States, in an Executive order issued, in which the Secretary of War and the Secretary of the Navy are directed to issue such orders and give such instructions to the army and navy as will insure the observance of the regulations and protection to persons lawfully engaged in and pursuing such trade in accordance with law and the regulations.
The Secretary of War, by General Orders No. 285, dated October 6, 1S64, directed all military officers to respect such permits and assist the agents of the Treasury Department in carrying them out.
No order upon the subject was issued by the Secretary of the Navy pntil December 1, 1864. Then, by General Order No. 42, of that date, the attention of commanding officers of squadrons, flotillas, and vessels of the navy employed on blockade duty, or in the Mississippi river, or other inland waters in the vicinity of the insurrectionary States, is required to the Executive order, &c., of September 24, 1864, *378 and ordering them to adopt snch measures as should be necessary to insure the strict observance of the orders by those under their command.
These orders were not received.by Commander Macomb until the 7th January, 1865, and until after the 41 bales cotton were seized and sent to Newbern. After the receipt of the orders through the regular naval authorities, upon application of the claimant, Commander Macomb indorsed his papers; and under orders from Mr. Eisley the cotton was shipped direct from Newbern to New York in the latter part of January, 1865, and was sold about the 5th or 6th of February following for the sum of 75¿ cents per pound.
The claimant alleges that if his cotton had not been seized, and, thereby detained by the acts of the officers of the United States, in violation of the terms of the agreement and his safe-conduct, it would have arrived in New York about the 10th or 12th of January, and, making reasonable allowances, would have been sold about the 15th or 16th of that month, when cotton was much higher, and rated at from $1 08 to $1 10 per pound. In making the division of the money after the sale the United States deducted $1,999 72 as charges upon the cotton at Newbern.
The claimant assumes—
1. That the seizure by the navy and detention of his cotton was a breach of the contract on the part of the United States, and that for such Jn'each he is entitled to recover in damages three-fourths of the increased price it would have brought if he had been permitted to ship the same at the time; and also the increased expenses to which it was subjected by such seizure and detention.'
2. That such violation of the contract operated as a rescisión of it, and entitled him to the whole proceeds of the property, irrespective of the agreement.
3. That it having been seized as captured and abandoned property, under the act of 12th of March, 1863, he is entitled to the net proceeds of the property, without deducting the 25 per cent, for the United States, stipulated for in the contract between himself and Eisley.
The case of Lane v. The United States (2 C. Cls., p. 184) has been pressed upon our attention as ruling this case. It is claimed that the principle decided there will embrace the case in hand. We do not think so. So far as the evidence goes it does not appear that Commander Macomb, or any other naval officer, ever made any report of this specific capture, and the time, place, &e., of doing so to the department. The evidence does not show that it was in any way brought under *379 review by tbe executive authoiities. There is nothing here upon which a ratification or adoption of the act of seizure can be predicated.
The officers who made the seizure, when they discovered the mistake, rectified it themselves and delivered up the property. The omission of the Secretary of the Navy to have the orders transmitted to the officers of the fleet’s flotillas at an earlier day is not a ground upon which the suit can be maintained. Every person engaging in such a trade, attended with so many hazards and vicissitudes, expects, for the large gains success brings, to assume all such as arise from the ignorance, perverseness, or cupidity of the agents and officers of the government he has to encounter in the progress of the adventure. It is only for the clear, distinct, authorized, or adopted acts of the government itself that it is to respond in damages.
It is not correct to say that where an individual has been injured by the acts of a public officer, either the officer or the government is liable to make reparation. On the contrary, we distinctly held in the Lane case that the naval forces patrolling- those waters had the right to seize and detain vessels engaged in this trade for such reasonable time as was necessary to assure the officers of the genuineness of the vessel’s papers, and of the right to trade with the enemy. And for such action neither the government nor the officer would be liable. This seizure appears to have been made in good faith, and in pursuance of orders previously received, which had not been either revoked or superseded by any official notification. The officer therefore could not be liable, as he was acting in the line of his duty, as instructed at the time; nor would the government be held responsible for the laches, omission, or accident, whichever it may have been, by which the President’s orders had failed to reach the naval officers in that region in due time.
Nor did it have the effect of annulling the contract. Both parties subsequently treated the contract as still in existence, and unaffected b'y anything which occurred. Both acquiesced in having the cotton sent to New York and there sold, according to the stipulations of the agreement. All the proceedings since the delivery of it have been founded on the contract; and we cannot now say that it was abrogated. This also disposes of the question as to whether it comes under the act of March 12,1863, relating to captured and abandoned property. We are clear it does not. It is not the net proceeds that the claimant was entitled to, but his proportion of the price, as fixed and settled by the contract, after deducting all proper and necessary charges.
And here, we think, is the only ground of claim shown by the plain *380 tiff in this case: The claimant’s property, against his consent, is taken and carried to a distant place. There it is put into the hands of a government officer, different from the place and person to whom it was to be delivered, by the contract. It was taken away by the officers of the United States, on their own ship; it was left and stored with their own officers. It turned out that all this was contrary to the contract, and the property is given up, to be disposed of under that contract. In the meantime it is burdened with an enormous expense for storage, fees, or charges, which are not specified, except in the gross sum of $1,999 72. These charges are deducted from the gross proceeds, and in the division of the remainder three-fourths of their amount falls upon the claimant. This is a wrong done to him, and in violation of the agreement. That made provision what expenses should be deducted. When the United States undertook to seize it as captured and abandoned property, and afterwards delivered it up under the contract, the expenses incurred during the seizure and detention are not to be thrown upon the claimant.
We therefore find for the claimant in the sum of fourteen hundred and ninety-nine dollars and seventy-nine conts ($1,499 79,) and for this amount a judgment will be entered in his favor.